UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

10 CV 9131

DGS FOREIGN TRADING (SHIPPING) LTD.

Petitioner

vs.

CHS, INC.

Respondent.

10-CV-

# MEMORANDUM OF LAW IN SUPPORT OF PETITION TO
## VACATE AWARD OF ARBITRATORS DATED SEPTEMBER 8, 2010

Of Counsel:

    Robert G. Clyne
    Lauren E. Komsa

# **TABLE OF CONTENTS**

**PAGE NO.**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

THE PANEL'S AWARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

POINT I:     THE ARBITRATION PANEL ACTED IN MANIFEST
             DISREGARD OF THE LAW WHICH REQUIRES THE
             AWARD TO BE VACATED . . . . . . . . . . . . . . . . . . . . . . . .   8

             A.    Arbitration Awards May Be Vacated Where It
                   Is Found That the Panel's Decision was
                   Rendered in Manifest Disregard of the Law . . . . . . .   8

             B.    The Panel's Decision Manifestly Disregarded
                   the Law on Contract Interpretation Because It
                   Plainly Ignored the Express Delivery Term
                   in Favor of Industry Custom and an Incorporated
                   Elevator Tariff Which Were Subordinate . . . . . . . . .   8

             C.    The Panel Disregarded the Law in Holding
                   that Failure to Make Delivery During the
                   Contractual Delivery Period Is Not a Breach . . . . . .   12

             D.    The Panel Established Its Own Standard
                   For When an FOB Seller Must Perform and
                   Then Proceeded to Disregard That Standard . . . . . . .   15

POINT II:    THE ARBITRATION PANEL EXCEEDED ITS
             AUTHORITY BE REWRITING THE CONTRACT
             AND EXCUSING CHS' ACKNOWLEDGED BAD
             FAITH ACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

             A.    The Panel Exceeded Its Power By Failing to
                   Enforce the Contract As Written, and Instead
                   Creating Its Own Public Policy in Holding
                   that the "Custom in the Trade" Allowed CHS
                   to Avoid the Express Terms of the Contract
                   if Doing So Would Be Economically Convenient
                   and Excusing its Breach of the Implied
                   Warranty of Good Faith and Fair Dealing . . . . . . . .   18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

## TABLE OF AUTHORITIES

<u>Case Name</u>

<u>Page No.</u>

AG Capital Funding Partners, L.P. v State St.
Bank & Trust Co., 10 A.D.3d 293, 781
N.Y.S.2d 88 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

Cruden v. Bank of New York,  957 F.2d 961,
976 (2d Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

First Commercial Financial Group, Inc. v.
Baghdoian, 812 F.Supp. 837 (N.D. Ill. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Hormel v. United Food & Comm. Workers,
879 F.2d 347, 351 (8th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

In re Riley, 908 N.Y.S.2d 534, 536 (N.Y.Sur.
2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

In the Matter of Arbitration Between Bear
Stearns N.Y, Inc. and Stinnes Interoil, Inc.
and Hill Petroleum Co., 1992 WL 12602174,
SMA No. 2910 (Sept. 29, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13-14

In The Matter of the Arbitration between
Golden Gate Petroleum and Nichimen
America, Inc., 1988 WL 1534476, SMA No.
2462 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

JPMorgan Chase Bank, N.A. v. IDW Group,
LLC,  2009 WL 321222, 4 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

New York & Cuba Mail S.S. Co. v.
Guayaquil & Q.R. Co., 270 F. 200, 202 (2d
Cir. 1920) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

Pagnan & F.LLI v. Miss. River Grain
Elevator, Inc., 700 F.2d 149 (5th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

PaineWebber Inc. v. Bybyk, 81 F.3d 1193 (2d
Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

Stolt-Nielsen, S.A v. Animalfeeds
International Corp., 130 S.Ct. 1758, 1767
(2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

T.Co Metals, LLC v. Dempsey Pipe &
Supply, Inc., 592 F.3d 329, 340 (2d Cir.
2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 12

Towers Charter & Marine Corp. v. Cadillac
Ins. Co., 894 F.2d 516, 523 (2d Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Town of Wawarsing v. Camp, Dresser &
McKee, Inc., 49 A.D.3d 1100, 1102, 855
N.Y.S.2d 691, 693 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United Paperworkers Int'l Union v. Misco,
484 U.S 29, 38, 108 S.Ct. 364, 371 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Vitol S.A., Inc. v. Koch Petroleum Group,
LP, 2005 WL 2105592, a *6 (S.D.N.Y.
August 31, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Western Union Tel. Co. v. American Comm.
Ass'n, C.I.O, 299 N.Y. 177, 86 N.E. 2d 162
(1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## Statutory Authority

**Page No.**

9 U.S.C. §10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
9 U.S.C. § 10(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## Other Authority

**Page No.**

Black's Law Dictionary 1379 (7th ed. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

22 N.Y. Jur. 2d Contracts § 283 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Albert Slabotzsky, Grain Contracts and
Arbitration For Shipments From the United
States and Canada 35 Lloyd's of London
Press Ltd. (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## PRELIMINARY STATEMENT

Petitioner, DGS Foreign Trading (Shipping), Ltd. ("DGS") submits this Memorandum of Law in support of its Petition to Vacate Award of Arbitrators Dated September 8, 2010 pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §10.

The underlying arbitration addressed a breach of contract action for the sale and purchase of soybeans to be loaded aboard a vessel in the U.S. for importation to Israel and Greece. The governing contract contained a specific delivery clause which specified the shipment period.

Petitioner submits that the arbitration panel, in a 2-1 decision, completely, utterly and manifestly disregarded the law in finding that "industry custom" vitiated any obligation on the part of an FOB Seller to make timely delivery pursuant to the express terms of the contract for the purchase and sale of a cargo of soybeans. The Panel didn't just ignore the delivery term which required delivery within the shipment period; it completely gutted it and, instead, essentially found that the seller can perform when it is "economically convenient" to do so. In fact the Panel did not even apply the very rule that it enunciated regarding when delivery is required.

Even worse, the Panel acknowledged that the Respondent, CHS, Inc. ("CHS") did not act in good faith and then excused this behavior by attempting to fashion its own rule of law regarding bad faith and breach. In doing so, the Panel exceeded its authority and has sent the worst of messages to grain sellers and buyers. That is, FOB Sellers only need to perform their contractual obligations when it is economically convenient for them and bad faith acts will be excused.

1

## STATEMENT OF FACTS

This dispute arises out of a contract for the purchase and sale of soybeans entered into between DGS and CHS.  The focal issue is whether CHS, as an FOB Seller, breached the contract for the supply of soybeans at the Myrtle Grove Elevator in New Orleans by failing to deliver the cargo to DGS' nominated vessel (M/V SAGALAND) within the shipment period prescribed in the governing contract.

The facts are not in dispute.  The essential terms of the contract were set forth in the Confirmation of Purchase and Sale dated June 25, 2008 ("Confirmation") which incorporates the Government of Israel Supply Mission ("GISM") Rules, as well as the latest North American Export Grain Association ("NAEGA") No. 2 Contract (collectively "the Contract").  (Ex. A to Declaration of Robert G. Clyne "Clyne Decl.").   The Contract, which is governed by New York law, provided for the sale of 46,000 M/T plus 9,000 M/T (10% +/-) of U.S. #2 or better yellow soybeans and included a shipment period of September 10-30.  (Ex. A to Clyne Decl.).  The Confirmation of Purchase and Sale provides in part:

| | |
|---|---|
| *Time of Shipment* | Sept 10-30, 2008 (both days included).  7 days preadvice of vessel's or sub's readiness to load. . . . |
| *Price* | U.S Funds $0.50 over Nov 2008 CBOT soybean futures in exchange or spotting the board, buyer's option, if vessel declared Sep 10-15, 2008 or $0.59 over if vessel declared Sep 15-20 or $0.48 over if vessel declared Sep 20-25 or $0.47 over if vessel declared Sep 25-30.  5 day position declared not later than Aug 20 2008. |

The Delivery Clause (clause no. 8) in the NAEGA No. 2 Contract is specific with respect to the FOB Seller's delivery obligation and provides in relevant part:

**8. Delivery**

Delivery shall be made between _____ and _____, both inclusive (the "delivery period"), at discharge end of loading spout, to buyer's tonnage in readiness to load, in accordance with custom of the port and subject to the elevator tariff to the extent that it does not conflict with the terms of this contract.  Incorporation of a loading rate guaranty in this contract shall not entitle seller to delay delivery.

\*               \*               \*

The vessel shall not be prevented from filing and from taking its place in the vessel line-up at the designated port/berth during the preadvice period or before commencement of the delivery period, notwithstanding which, seller shall not be obliged to effect delivery to the vessel before the expiration of the preadvice period or before commencement of the delivery period."

With respect to delays in delivery, the Contract is equally specific as to how and when delays in performance may be excused.  Clause 20 of the NAEGA No. 2 contract reads as follows:

(a) This clause shall apply if delivery by seller of the commodity, or any part thereof, is prevented or delayed at the port(s) of delivery and/or elevator(s) of delivery or elsewhere, or if the forwarding of the commodity to such port(s) and/or Elevator(s) is prevented, by reason of the causes enumerated in paragraph (b) below; PROVIDED that seller shall have sent notice to buyer no later than 2 business days after the date of commencement of the causes, or not later than 2 business days after the 1st day of the delivery period, whichever occurs later ... and PROVIDED further that seller shall, at buyer's request, furnish a certificate of the North American Export Grain Association, Inc. certifying the existence and the duration of the causes. Such certificate shall be final.

(b) The causes of delay and/or prevention ("causes" referred to in paragraph (a) above shall be:

(1) Riots, strikes, lockouts, interruptions in or stoppages of the normal course of labor
(2) Embargoes or exceptional impediments to transportation
(3) Action by Federal, State or local government or authority"

3

Clause 20 of the Contract could be invoked when the conditions contained therein are met, in which case the Seller's obligation to make delivery is suspended while such causes are in effect. However, the Panel found that CHS did not invoke Clause 20, and, therefore, the Clause could not serve to excuse the delay in performance. (Award, p. 11).[1]

Clause 22 of the Contract, which governs Defaults, provides:

**22. Default**

> In case of default by either party, the other party shall be at liberty, after giving notice, to resell or repurchase, as the case may be, without undue delay and the defaulting party shall make good the loss, if any, to the other party but the defaulting party shall not be entitled to any profit. If the non-defaulting party has not repurchased or resold the commodity by the 10th calendar day after the giving of notice of default, the market value on the said 10th day shall be used for settlement purposes. If such 10th day falls on a non-business day, the market value on the previous business day shall govern. In the event of a default by buyer, the sale price under this contract shall automatically be increased by the value of carrying charges calculated up to the date of resale, or the 10th calendar day after the giving of notice of default, whichever is applicable.

It is undisputed that DGS complied with its contractual obligations regarding pre-advice, tendering of Notice of Readiness ("NOR") and arranging for the M/V SAGALAND to be in all respects ready to load the contracted cargo within the shipment period. In accordance with the Contract terms, the M/V SAGALAND was nominated to load the full cargo of 55,000 metric tons on September 9, 2008 (Award, p. 4). Under the contract, DGS declared the delivery period as September 15-20, 2008. (Award, p. 3). The vessel arrived at the load port and tendered NOR on September 18 and was in all respects ready to load on September 19. (Award, p. 4)[2]. Upon arrival, the M/V SAGALAND was placed in the vessel lineup to load at CHS' Myrtle Grove Elevator as per the custom in the port.

---

[1] "Award p. ___" references a specific page cite to the Award of Arbitrators dated September 8, 2010, which is annexed to the Declaration of Robert G. Clyne at Exhibit I.
[2] None of these facts are in dispute.

The Panel found that CHS and its broker "strung DGS along by telling it that the vessel would be loaded first on September 23rd, then on the 19th-21st, then 25th-27th, then October 1st, then 9/29-10/1/08, then back to October 1st and finally October 7th." (Award, p. 11).

In fact, however, on September 26, 2008, CHS caused the M/V SAGALAND to be moved from 5th in line to 12th in line for loading. (Award, p. 10). When the M/V SAGALAND was finally called to the berth on October 7th, CHS advised that, "CHS will load as many beans on average grades as fast as possible until October 8th at midnight." (Award, p. 7). This did not happen. The M/V SAGALAND stopped loading at 4:25 p.m. (rather than the promised 12:00 a.m.) because, "All soybeans available [were] loaded into vessel." (Award, p. 7). The M/V SAGALAND was, therefore, taken off the berth on October 8 at 5:40 pm, and the M/V JIN RONG, a vessel which had arrived later than the M/V SAGALAND, was brought in to berth. (Award, p. 7). The M/V SAGALAND eventually returned to the Myrtle Grove elevator at 5:25 am on October 11, 2008, and completed loading 62,655,800 lbs (28,420.187 MT) of Yellow Soybeans on October 12, 2008. (Award, p. 7).

Towards the end of September, it became clear that CHS was not going to meet its obligation to load the M/V SAGALAND by the end of the shipment period (i.e. 9/30/08). In attempt to mitigate its damages, DGS arranged for an 8 day extension to perform (with appropriate discounts to its buyers) under its resale contracts. However, as a result of CHS' failure to timely load the M/V SAGALAND, even within the 8 day extended period, DGS was unable to perform its resale contracts with its Greek and Israeli customers, forcing DGS to incur damages in excess of a million dollars.

The evidence establishes that CHS did not have the cargo available for loading when the M/V SAGALAND was presented within the delivery period or even at the end of the delivery

period, and did not have any justifiable reason for the late delivery. CHS has never articulated a precise reason for the delay in loading, or for manipulating the line-ups. Rather, CHS's only position was that all of its actions were justified by "elevator convenience," which, according to the Panel includes the seller's "economic convenience." (Award, p. 9).

## THE PANEL'S AWARD

The Panel's Award is attached to the Clyne Declaration as Exhibit I. The Panel's key findings were as follows:

1.   An FOB seller under a NAEGA No. 2 contract is not obliged to have the contracted cargo in place to load the vessel until the latest of the following conditions has occurred: (a) the first day of the established delivery period; (b) the expiration of the pre-advice period; or (c) the time at which the vessel takes its proper turn in the line-up, according to its "turn" in the vessel-line-up. (Award, p. 9). An FOB seller's obligation is to have the goods in place to pour into the vessel when the vessel takes its *proper* turn in the berth, regardless of whether this is within the delivery period or not. (Award, p. 9).

2.   There is no absolute obligation under a NAEGA FOB contract, to load within the delivery period, no matter when the vessel files with the elevator. (Award, p. 9).

3.   It is the custom of the grain trade that an FOB seller does not need to have the cargo available for loading during the shipment or delivery period and has no obligation to load the cargo within the delivery period. (Award, p. 10).

4.   It is a standard term in a grain elevator tariff, as in the Myrtle Grove elevator tariff, that the elevator may alter the turn of vessels when, in its judgment, it is in the best interest of its operations. As practice of the trade, "elevator convenience" has been consistently interpreted

6

in the trade to also include the economic convenience of the seller/shipper.  The Panel did

not cite to any interpretation or industry document and imposed no reasonableness standard

that attached to the seller's ability to rely on elevator convenience in order to excuse its

untimely delivery.  The Panel also did not make any findings as to what it was that made

loading the M/V SAGALAND on October 12, or 12 days past the last day of the delivery

period, more "convenient" for "elevator operations."  (Award, p. 10).[3]

5.     Although CHS did not load the M/V SAGALAND until October 12 (12 days past

the end of the contractual delivery period), CHS did not breach the Contract because the

M/V SAGALAND was loaded "in accordance with the custom of the port and the elevator

tariff".  (Award, p. 10).

6.     Under a NAEGA No. 2 Contract, failure to deliver the contracted for cargo within the

contractual delivery period is not a breach of contract.  Rather, the only "breach" under a

NAEGA No. 2 contract is a non-delivery of the cargo.  (Award, p. 10).

7.     For delay in performance past the last day of the delivery period, the buyer's remedy is to

declare the seller in default under the contract, and buy in another cargo.  (Award, p. 10).

8.     Under New York law, which governs the NAEGA contract, there is an implied

covenant of good faith and fair dealing.  (Award, p. 11).

9.     Under many contracts, CHS would have been found to have breached the contract, but

under a NAEGA contract, CHS's actions did not constitute a breach because of the

---

[3] The Chairwoman of the Panel, Ms. Lucienne Bulow dissented on this point as follows, "While agreeing that it is custom of the trade to allow for invocation of 'elevator convenience' as an accepted method of the trade to bypass vessels under some circumstances, it is Ms. Bulow's opinion that the excuse of 'elevator convenience' should be subject to some type of reasonable time limit and that the delay in loading the M/V SAGALAND was excessive. CHS should have made sure that the soybean cargo was completely loaded by October 8, 2008.  As can be seen from the recitation of the facts, CHS did not supply any soybeans to DGS' waiting vessels until October 8."

incorporation of the terms of the tariff, and therefore, the 'elevator convenience' term allowing a change of loading rotation.  (Award, p. 11).

## POINT I
## THE ARBITRATION PANEL ACTED IN MANIFEST DISREGARD OF THE LAW
## WHICH REQUIRES THE AWARD TO BE VACATED

**A.**     **Arbitration Awards May Be Vacated Where It is Found That the Panel's Decision was Rendered in Manifest Disregard of the Law**

The Second Circuit continues to recognize the manifest disregard standard as a valid ground for vacating arbitration awards.  T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 340 (2d Cir. 2010).  In order to vacate an arbitration award under the manifest disregard of the law standard, a court first must consider whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators; second, the court must find that the law was in fact improperly applied, leading to an erroneous outcome; and third, the court looks to a subjective element, that is, the knowledge actually possessed by the arbitrators, because in order to intentionally disregard the law, the arbitrator must have known of its existence, and its applicability to the problem before him.  Id. at 339.

**B.**     **The Panel's Decision Manifestly Disregarded the Law on Contract Interpretation Because It Plainly Ignored the Express Delivery Term in Favor of Industry Custom and an Incorporated Elevator Tariff Which Were Subordinate**

The Delivery Clause (clause no. 8) in the NAEGA No. 2 Contract is specific with respect to the FOB Seller's delivery obligation and provides in relevant part:

> **"8. Delivery**
> Delivery shall be made between _____ and _____, both inclusive (the "delivery period"), at discharge end of loading spout, to buyer's tonnage in readiness to load, in accordance with the custom of the port and subject to the elevator tariff *to the extent that it does not conflict with the terms of this contract* [emphasis added].  Incorporation of a loading rate guaranty in this contract shall not entitle seller to delay delivery."

The NAEGA No. 2 Contract is a classic FOB contract. "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." Cruden v. Bank of New York, 957 F.2d 961, 976 (2d Cir.1992). "A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." Id.

The delivery term in the NAEGA No. 2 contract could not be clearer. Clause 8 stipulates that "delivery *shall* be made between ___ and ___ [emphasis added]." The word "shall" is clearly a mandate and allows no variation. In re Riley, 908 N.Y.S.2d 534, 536 (N.Y.Sur. 2010). See also Black's Law Dictionary 1379 (7th ed. 1999) (The word 'shall' is defined as, 'Has a duty to; more broadly, is required.').

It is plainly evident and undisputed that CHS, as the FOB seller, did not complete the loading of the soybeans within the contractual delivery period. The contractual delivery period called for the cargo to be loaded by September 30, 2008 (Ex. A to Clyne Decl.). Loading was not completed until October 12, 2008. This late loading constitutes a material breach of the Contract.

The Panel, however, ruled that no breach occurred because an FOB Seller, "does not need to have the cargo available for loading during the shipment or delivery period and has no obligation to load the cargo within the delivery period. . ." (Award (Ex. I to Clyne Decl.) p. 10). Under the standard set forth in T.Co Metals, LLC, this holding represents a manifest disregard of the law and, in particular, the express terms of the contract.

The law on contract interpretation is crystal clear. In interpreting a contract under New York law, words and phrases are to be given their plain meaning, and a court should enforce the

plain meaning of that agreement rather than rewrite an unambiguous agreement. PaineWebber Inc. v. Bybyk, 81 F.3d 1193 (2d Cir. 1996). Similarly, where the language of a contract is unambiguous, there is no occasion to resort to other means of interpretation. Western Union Tel. Co. v. American Comm. Ass'n, C.I.O, 299 N.Y. 177, 86 N.E. 2d 162 (1949). The custom in the industry[4] may not be used to subvert the agreement's plain meaning. AG Capital Funding Partners, L.P. v State St. Bank & Trust Co., 10 A.D.3d 293, 781 N.Y.S.2d 88 (2004) (evidence of custom in the industry cannot be used to vary the plain meaning of the word "deliver").

Next, the law was improperly applied, in that the Panel disregarded the clear language of the contract. Indeed, although the contract dictated that delivery was to be made between September 10-30, the Panel nevertheless held that CHS, "[did] not need to have the cargo available for loading during the shipment or delivery period and ha[d] no obligation to load the cargo within the delivery period." (Award, p. 10). It is beyond comprehension how the Panel could have re-written the terms of the unambiguous contract terms.

Third, the Panel was well aware of the existence of the law on contract interpretation, and that this law was to be used in interpreting the NAEGA No. 2 contract. This issue was briefed by DGS, and the Contract clearly called for the application of New York law. (Exs. A and G to Clyne Decl.) For instance, in DGS' main brief, it advised:

> Under basic contract law, the contract terms are to be given their plain and ordinary meaning. Town of Wawarsing v. Camp, Dresser & McKee, Inc., 49 A.D.3d 1100, 1102, 855 N.Y.S.2d 691, 693 (2008) ("Where unambiguous, the contract language should be given its plain and ordinary meaning."). The delivery term in the NAEGA No. 2 contract could not be clearer. Clause 8 stipulates that "delivery **shall** be made between ___ and ____ [emphasis added]. (Ex. G to Clyne Decl.)

---

[4] Clause 8 references in a subordinate way the "custom in the port" as opposed to the "custom of the trade" which is the phrase consistently utilized by the Panel in the Award and which finds no basis in the contract.

Although it was well aware of the law and the plain wording, the Panel nevertheless rewrote the

contract to arrive at its desired result.  This constitutes a manifest disregard of the law.  See e.g

United Paperworkers Int'l Union v. Misco, 484 U.S 29, 38, 108 S.Ct. 364, 371 (1987)("arbitrator

may not ignore the plain language of the contract."); Hormel v. United Food & Comm. Workers,

879 F.2d 347, 351 (8th Cir. 1989) (arbitration award may be vacated where "a decision does

not account for essential clauses and does not give a reason for the failure to mention

essential clauses" in a contract).

Additionally, the contract *itself* covenanted that delivery was to be made between

September 10 and September 30, in accordance with custom of the port and subject to the

elevator tariff *to the extent that it does not conflict with the terms of this contract* [emphasis

added].

Item No. 52 of the Myrtle Grove Elevator tariff states, "Elevator Management may alter

the turn of vessels to be loaded, when, in its sole judgment, this is in the best interest of the

Elevator operations."[5]  In this case, however, CHS' decision to alter the turn of the vessels

created a clear and unmistakable conflict with the express terms of the contract because it fatally

caused the loading to occur beyond the shipment period and any extensions that could be

obtained therefrom.  In this circumstance, neither the custom nor the tariff could excuse a failure

to perform within the delivery period.

The Panel was repeatedly advised of the law regarding contract interpretation, as set forth

above.  Nevertheless, the Panel not only relied upon the elevator tariff and the custom in the

industry in a way that directly conflicts with the unambiguous terms of the contract, the Panel

elevated these incorporated terms above the delivery term when they were supposed to be

---

[5] The CHS Tariff is a lengthy document maintained by CHS.  It contains boilerplate terms such as Item No. 52 that are not negotiated (nor is the reference to it in the delivery clause - Clause 8) and are written solely for the seller's benefit.

subordinate.  Accordingly, the Panel plainly disregarded the law, and the terms of the Agreement.

### C.   The Panel Disregarded the Law in Holding that Failure to Make Delivery During the Contractual Delivery Period Is Not a Breach

Under both New York law, and the law in general, late delivery constitutes a material breach of a contract. Under the T.Co Metals standard, the Panel's failure to apply the law constituted a manifest disregard of the law.  T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 340 (2d Cir. 2010).

The law on breach of a contractual delivery term is clear.  Under New York law, a seller under an FOB contract, "must deliver the goods on the date or within the agreed period at the name port of shipment and in the manner customary at the port on board the vessel nominated by the buyer." Vitol S.A., Inc. v. Koch Petroleum Group, LP,  2005 WL 2105592, a *6 (S.D.N.Y. August 31, 2005). "The duty of the shipper is to have his cargo ready when the ship arrives in accordance with his contract." New York & Cuba Mail S.S. Co. v. Guayaquil & Q.R. Co.,  270 F. 200, 202 (2d Cir. 1920).  See also In The Matter of the Arbitration between Golden Gate Petroleum and Nichimen America, Inc., 1988 WL 1534476, SMA No. 2462 (1988). Additionally, in commercial contracts, such as the contract at issue in this case, "time is presumptively of the essence."  22 N.Y. Jur. 2d Contracts § 283 (2010); New York & Cuba Mail S.S. Co. v. Guayaquil & Q.R. Co., 270 F. 200 (2d Cir. 1920).  "New York law requires that contract provisions specifying dates for performance be strictly enforced in a contract action at law.  In such an action, the parties are presumed to have agreed that time is of the essence unless there is contract language to the contrary." Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 523 (2d Cir.1990).  In determining whether there has been a breach of the contract,

the provisions specifying the date or dates for performance will be strictly enforced.  Id.  The

timing of the shipment was a crucial element of the seller's contractual obligations, as evidenced

by the fact that a different price attached to the various 5 day periods within the shipment period

as follows:

> **Price**
>
> U.S Funds $0.50 over Nov 2008 CBOT soybean futures in exchange or spotting the board, buyer's option, if vessel declared Sep 10-15, 2008 or $0.59 over if vessel declared Sep 15-20 or $0.48 over if vessel declared Sep 20-25 or $0.47 over if vessel declared Sep 25-30.  5 day position declared not later than Aug 20 2008.

(See Ex. A to Clyne Decl.)

As stated in Mr. Albert Slabotsky's manual on grain trading arbitration:[6]

> Time of delivery or of shipment in contracts for the sale of these goods is regarded as "of the essence"- a sensible rule, since commodity prices fluctuate constantly.  *Force majeure* can, of course, justify delays, but the rule is otherwise stringent.  A judgment by the English Court of Appeal states: 'In light of what was said by their Lordships [in a House of Lords case] I think it can fairly be said that in mercantile contracts stipulations as to time not only may be, but usually are, to be treated as being 'of the essence of the contract', even though this is not expressly stated in the words of the contract.

Albert Slabotzsky, Grain Contracts and Arbitration For Shipments From the United States and

Canada 35  Lloyd's of London Press Ltd. (1984).  (See Ex. H to Clyne Decl.).

Similarly, the arbitration panel in In the Matter of Arbitration Between Bear Stearns N.Y,

Inc. and Stinnes Interoil, Inc. and Hill Petroleum Co., applying New York law, properly set forth

the law, that a delivery period is an essential term in the contact, and failure to perform within

the contractual delivery period constitutes a material breach:

> We think the three most significant provisions of a contract are description of the goods, price and time of delivery.  We believe with goods of rapidly

---

[6] Slabotsky, Grain Contracts and Arbitration, which has been approvingly cited by the Panel.  A true and accurate copy of the relevant pages are attached to the Clyne Decl. as Ex. H.

fluctuating value, time of delivery may be the most important of the three. When goods do not conform to specifications or contract price, modifications can be agreed. **But when the delivery period is not met, an essential contract term has been forever breached** [emphasis added]. Absent a novation, there is no way the parties can revive an expired delivery period. That law does not apply nunc pro tunc. The clock may not be turned back without mutual agreement. Time of delivery is not a "best efforts" doctrine; it is a term for planning. There also may be related contracts of which time may be of the essence: a charter party or a letter of credit, for example. The Stinnes-Hill contract time window was common to the other contracts in the chain. Failure to meet that delivery requirement results in a domino effect on the others. A delivery window often fixes cost and risk allocation. Here the window controlled the time of delivery and cost of the gasoline. Extending the delivery period may alter the price of the goods: a significant risk in a volatile market.

In the Matter of Arbitration Between Bear Stearns N.Y., Inc. and Stinnes Interoil, Inc. and Hill Petroleum Co., 1992 WL 12602174, SMA No. 2910 (Sept. 29, 1992)[7].

This law was completely ignored. Although CHS failed to deliver the soybeans during the contractual delivery period, the Panel nevertheless did not find this to be a breach.

Finally, the Panel had actual knowledge of the law, as this issue was fully briefed and discussed in detail in DGS' Post Hearing Brief. (Ex. G to Clyne Decl.). Nevertheless, for some unknown reason, the majority of the Panel refused to apply the law or ignored it altogether. Instead, the Panel ruled that a specific, express, contractual delivery period has no effect. Under the Panel's view, a seller may deliver the cargo whenever it deems that it is economically convenient to do so. (Award, p. 9). This ruling must not stand. If it does, it will create commercial havoc in the international market place and undermine the very purpose of having a contract in place at all.

DGS does not dispute that it is custom in the trade to require a vessel to wait its turn to load pursuant to a *proper* line-up rotation or even to allow for invocation of "elevator

---

[7] This case was not only brought to the Panel's attention, a copy of it was provided to the Panel along with the other cases cited by the parties.

convenience" as an accepted method of the trade to bypass some vessels under some circumstances.  (Award, p. 10, FN 2, *Bulow dissent).*  However, DGS vigorously disputes that the "economic convenience of the seller" constitutes a circumstance under which the FOB Seller may skirt its obligation to have the cargo ready and to timely deliver, especially when the basis for invoking economic convenience is in direct contravention of an explicit delivery term.

**D.   The Panel Established Its Own Standard For When an FOB Seller Must Perform and Then Proceeded to Disregard That Standard**

The Award issued by the Panel contains fatal inconsistencies.  On pages 9-10 of its Award, the Panel ruled:

> It is the Tribunal's opinion that an FOB seller's obligation is to have the goods in place to pour into the vessel when the vessel takes its proper turn in the berth whether it is within the delivery period or not.  However, there is no absolute obligation under a NAEGA FOB contract, to load within the delivery period, no matter when the vessel files with the elevator.
>
> $*$ $*$ $*$
>
> If lateness in performance does not rise to a breach of contract under a NAEGA 2 contract, what does?  Under such a contract, a breach of contract by a seller would entail non-delivery of the cargo.  In this case, CHS eventually supplied the cargo.  For delay in performance past the day of the delivery period, the remedy could be for the buyer to declare the seller in default under Clause 22 of the Contract if the cargo is not loaded by the end of the delivery period and to buy in another cargo.  The damages which the seller would have to pay would then be the difference between the market price and the contract price.

In contrast to the express provisions of the delivery term, the Panel's view is that the only obligation of an FOB seller is to have the goods in place to pour into the vessel when the vessel takes its *proper*[8] turn in the berth whether it is within the delivery period or not.  Under its own enunciated standard, then, CHS breached its most basic obligation.  It is undisputed that the M/V

---

[8] The majority's conclusion that the vessel took its "proper" turn in the berth after being moved for no good reason from the 5th to the 13th spot, is more than eyebrow raising.

SAGALAND berthed at the CHS elevator berth at 00:20 on October 8, 2008.  As the Panel found, "According to Mr. Sackmaster's testimony at the hearing, the SAGALAND was supposed to load as many beans as possible as fast as possible until midnight on October 8, but the loading was stopped at 4:25 pm as there were no more beans." (Award, p. 7).  The Panel further found that, "the SAGALAND was, therefore, taken out of berth on October 8 at 5:40 pm," having loaded less than the entire cargo, or even the agreed upon amount.  (Award, p. 7).  Accordingly, even under the Panel's own standard, CHS breached its obligation by failing to have the soybeans in place to pour into the M/V SAGALAND when it took its turn in the berth on October 8.  Indeed, this was the position taken in the dissent, which stated that, "CHS should have made sure that the soybean cargo was completely loaded on the SAGALAND by October 8, 2008." (Award, p. 10, FN 2).

The Panel then went on to hold that an aggrieved buyer's remedy for "delay in performance past the day of the delivery period" is for, "the buyer to declare the seller in default under Clause 22 of the Contract if the cargo is not loaded by the end of the delivery period and to buy in another cargo." (Award, p. 10).  Thus, under the Panel's view, the buyer's remedy is to declare a default, even though there is no breach.  This creates an even further absurdity within the award.  If there is no breach (because, according to the Panel, there is no obligation on the part of a seller under an FOB contract to load within the delivery period) how could the remedy of default be available?  Indeed, in the very industry treatise upon which the Panel approvingly relies, a "default" is defined as, "a most severe breach."[9]  Under the majority of the Panel's view,

---

[9] Slabotsky, Grain Contracts and Arbitration, which has been approvingly cited by the Panel, provides that a "default" is a most serious breach.  ("Some breaches are of so severe a nature that they not only permit the injured party to ask for damages, but also excuse it from further performance.  These are the "defaults" referred to by English contracts and by NAEGA 2.")   A true and accurate copy of the relevant pages are attached to the Clyne Decl. as Ex. H.

a seller may invoke "elevator convenience," to excuse it from timely performance, yet, the buyer can declare default in performance if not timely. This is inherently illogical and when coupled with the misleading statements made by CHS regarding performance as outlined in the Award, it is completely unworkable.[10]

## POINT II
### THE ARBITRATION PANEL EXCEEDED ITS AUTHORITY BY REWRITING THE CONTRACT AND EXCUSING CHS' ACKNOWLEDGED BAD FAITH ACTS

When an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice, his decision may be unenforceable under the FAA. Stolt-Nielsen, S.A v. Animalfeeds International Corp., 130 S.Ct. 1758, 1767 (2010), "In this situation, an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator 'exceeded [his] powers,' for the task of an arbitrator is to interpret and enforce a contract, not to make public policy." Id. "The presumption of validity traditionally accorded to arbitration awards is unavailing where the award disregards and irrationally contradicts the express terms of a contract between the parties." First Commercial Financial Group, Inc. v. Baghdoian, 812 F.Supp. 837 (N.D. Ill. 1993).

Rather than inquiring whether the contract, the FAA or New York law would support its result, the Panel, "proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule of law to be applied in such a situation." Stolt Nielsen, 130 S.Ct. at 1768-9. "The conclusion is inescapable that the panel simply imposed its own conception of sound policy. Id. at 1769.

---

[10] CHS never introduced evidence during the arbitration hearing as to what exactly made it more "convenient" for the elevator not to load the M/V SAGALAND until October 12. No elevator personnel testified at the hearings, and there was no documentary evidence submitted on this point. Indeed, the Panel made no findings, either. The evidence produced by CHS during discovery indicates that the contractual cargo had not been procured to be available for loading during the contractual delivery period.

A.    **The Panel Exceeded Its Power By Failing to Enforce the Contract As Written, and Instead Creating Its Own Public Policy in Holding that the "Custom in the Trade" Allowed CHS to Avoid the Express Terms of the Contract if Doing So Would Be Economically Convenient and Excusing its Breach of the Implied Warranty of Good Faith and Fair Dealing**

The Panel provided many examples of CHS acting in breach of the contract, and/ or in breach of the implied covenant of good faith and fair dealing.

> The "The Tribunal does not wish to excuse CHS' behavior on many issues. Under New York law, which governs the NAEGA contract, there is an implied covenant of good faith and fair dealing. It appears from the evidence that CHS already expected in late August that it would not be able to load soybeans on DGS' vessel before the end of September... CHS and Jim Connor, the broker in this contract, nevertheless strung DGS along by telling it that the vessel would be loaded first on September 23rd, then on the 19th-21st, then 25th-27th, then October 1st, then 9/29-10/1/08, then back to October 1st, and finally October 7th. There is no doubt that CHS could have been more forthcoming in its dealings with its buyer. On many occasions, CHS and Mr. Connor sent communications to DGS which were not clear as to whether CHS had a legitimate reason to invoke Clause 20 for M/V Sagaland, which would have helped DGS in its attempt to be excused for delay in performance under its GAFTA contract. Mr. Sackmaster also was not completely forthcoming when he advised that the Sagaland would be loading on October 8, 2008 until midnight. As it developed, the SAGALAND was told to leave the berth at 4:30 p.m because all available soybeans had been loaded.

The Panel then concluded that, despite engaging in all of the aforementioned acts, CHS nevertheless did not breach the contract:

> **Under many contracts, CHS would have been found to have breached the contract, but under a NAEGA contract, all these factors do not rise to the level of a breach of contract** because of the incorporation of the terms of the tariff, and therefore, the "elevator convenience" term allowing a change of loading rotation. This is the established custom of the trade [emphasis added].

Thus, according to the Panel, CHS' behavior, in engaging in all of the misleading acts and/or then taking the SAGALAND off the berth, because it did not have the cargo, would be a breach under many contracts. However, because this is a NAEGA No. 2 contract, which incorporates the concept of "elevator convenience," a seller may knowingly and intentionally

breach the express terms of a contract, if, in its unfettered discretion, it determines that doing so would be more economically convenient.  The Fifth Circuit has previously determined that this position is untenable.  See Pagnan & F.LLI v. Miss. River Grain Elevator, Inc., 700 F.2d 149 (5th Cir. 1983) (a seller may not rely upon elevator convenience to excuse its willful breach of a contract).  By setting up an illegitimate standard for actionable breach, the Panel facilitated its own finding that CHS' bad faith acts are not actionable because elevator convenience excuses performance.

Under New York law, there exists an implied covenant of good faith and fair dealing, pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. JPMorgan Chase Bank, N.A. v. IDW Group, LLC,  2009 WL 321222, 4 (S.D.N.Y. 2009).

CHS' bad faith conduct, in providing misleading information to DGS, deprived DGS of its legal rights, even as interpreted by the Panel.  Under the Panel's standard, "for a delay in performance past the day of the delivery period, the remedy could be for the buyer to declare the seller in default under Clause 22 of the Contract if the cargo is not loaded by the end of the delivery period and to buy in another cargo." (Award, p. 10).  Had CHS timely informed DGS that it was unable to load during the contractual time period, DGS could have terminated the contract, and bought in another cargo.  However, as the Panel held, CHS, "strung DGS along by telling it that the vessel would be loaded first on September 23rd, then on the 19th-21st, then 25th-27th, then October 1st, then 9/29-10/1/08, then back to October 1st, and finally October 7th." (Award, p. 11)."  In the meantime, CHS never took any steps to procure the cargo necessary to comply with its contractual obligation.  Accordingly, even under the Panel's view, DGS was

unable to exercise its legal remedy of declaring a default, because CHS misrepresented the expected loading date, such that the possibility of buying in another cargo was foreclosed.

However, for purposes of this motion, whether New York recognizes a cause of action for breach of an implied covenant of good faith and fair dealing is irrelevant. What is relevant is that the majority of the Panel exceeded its authority by attempting to set a new and inappropriate public policy, in direct contravention of the law. According to the new, unprecedented policy a seller under a NAEGA No. 2 contract may breach the express terms of a contract, and may also act in bad faith, so long as they determine that doing so would be more economically beneficial under the guise of "elevator convenience."

The award completely ignores and violates the understanding between the parties and the established law. The award is based entirely on the "custom of the trade" which contradicts the plain language of the contract and the established law and which was rejected by the Panel Chair.

This award must be vacated because, as written, a seller has no obligation to load within the delivery period despite the clear understanding between the parties. Instead, the seller can load whenever it is "economically convenient" to do so. This creates a significant and unwarranted risk to international trade. Moreover, the award condones bad faith behavior by relieving the seller of any of his contractual obligations to timely deliver. Accordingly, the circumstances compel a vacatur of the Award.


## CONCLUSION


For all of the foregoing reasons, Petitioner DGS respectfully requests that the Court vacate the Award of Arbitrators dated September 8, 2010, in its entirety.

Dated: December 7, 2010

HILL RIVKINS LLP
Attorneys for Petitioner,
DGS Foreign Trading (Shipping) Ltd.

By: _____
Robert G. Clyne
Lauren E. Komsa
45 Broadway, Suite 1500
New York, NY 10006
Tele: 212-669-0600